[Cite as *Licking Hts. Local Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision*, 2019-Ohio-5082.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

Licking Heights Local Schools
Board of Education,                        :

                                           :

        Appellant-Appellant,           :                    No. 18AP-345

                                           :              (BTA No. 2016-2685)

v.

                                           :             (REGULAR CALENDAR)

Franklin County Board of Revision et al.,

                                           :

        Appellees-Appellees.           :

                                           :

---

D E C I S I O N

Rendered on December 10, 2019

---

**On brief**: *Rich & Gillis Law Group LLC*, *Mark H. Gillis*, and *Kelley A. Gorry*, for appellant. **Argued**: *Kelley A. Gorry*.

**On brief**: *Vorys Sater Seymour and Pease LLP*, *Nicholas M.J. Ray*, *Lauren M. Johnson*, and *Mitchell A. Tobias*, for appellee Jefferson Chase OH Partners, LLC. **Argued**: *Lauren M. Johnson*.

---

APPEAL from the Ohio Board of Tax Appeals

BROWN, J.

{¶ 1} Licking Heights Local Schools, Board of Education ("BOE"), appellant, appeals from a decision and order of the Ohio Board of Tax Appeals ("BTA"), in which the BTA established the true value and taxable value of real property owned by Jefferson Chase OH Partners, LLC ("Jefferson Chase"), appellee.

{¶ 2} The present case concerns a 240-unit apartment complex. The property was sold in October 2014 as part of a transaction involving several other properties. Jefferson Chase is the current owner of the property. Prior to Jefferson Chase's ownership, the

property was in bankruptcy receivership. As pertinent here, the Franklin County Auditor valued the property at $13,253,000, as of the tax lien date January 1, 2015. Jefferson Chase filed a complaint against valuation regarding the tax year 2015 valuation requesting a decrease in value to $10,800,000. The BOE filed a counter complaint in favor of the valuation.

{¶ 3}    A hearing was held before the Franklin County Board of Revision ("BOR"). At the hearing, Jefferson Chase presented evidence in favor of a valuation of $13,014,300 as of the tax lien date. Jefferson Chase also asserted the October 2014 sale was not an accurate valuation of the property because it was a forced sale, and the BTA had already found such in unrelated cases involving the other properties. The BOE presented two appraisals prepared in connection with the October 2014 sale for values of $15,275,000 (the Cushman & Wakefield "C&W" appraisal) and $14,900,000 (the Butler Burgher Group "BBG" appraisal), as well as the appraisal of Thomas D. Sprout in the amount of $17,429,000, as of the tax lien date. On December 2, 2016, the BOR issued a decision in which it found the October 2014 sale of the property, as previously accepted by the BOR for tax year 2014 was the best evidence of value and found no change in value was warranted for tax year 2015, thereby retaining the auditor's valuation of $13,253,000. The BOE appealed.

{¶ 4}    A hearing was held before the BTA. The BOE presented the testimony of Sprout, who revised his valuation downward to $16,040,000, as of the tax lien date. Jefferson Chase submitted the appraisal of Melissa Dean Speert, who valued the property at $11,120,000 as of the tax lien date.

{¶ 5}    On April 17, 2018, the BTA issued a decision and order. The BTA initially noted that both parties acknowledged the sale of the property in October 2014 was not reliable as to value, as it was conducted by a receiver and, therefore, a forced sale. The BTA found Speert's analysis more probative of value on the tax lien date. Therefore, based on Speert's appraisal, the BTA found the true value of the property as of January 1, 2015 was $11,120,000. The BOE appeals the judgment of the trial court, asserting the following assignments of error:

> [I.]   The BTA abused its discretion in determining that the Board of Education's appraiser Mr. Sprout appraised the Subject Property as renovated by post-lien date cosmetic

renovations when the entire record is devoid of any evidence whatsoever to support such finding.

[II.] The BTA abused its discretion in determining that Mr. Sprout appraised the Subject Property as renovated by post-lien date cosmetic renovations when the record unequivocally confirms that Mr. Sprout considered only fire damage repaired by the former owner in 2013 approximately one year prior to the lien date.

[III.] The BTA abused its discretion in citing to one sentence in the Sprout Appraisal in isolation when the entire appraisal and Mr. Sprout's testimony at the hearing confirm that Mr. Sprout did not consider the post-lien date cosmetic renovations in valuing the Subject Property as of the lien date.

[IV.] The BTA erred in failing to consider the two financing appraisals and Mr. Sprout's testimony thereof pursuant to *AP Hotels of Illinois, Inc. v. Franklin Cty. Bd. of Revision*, 118 Ohio St.3d 343, 2008-Ohio-2565, 889 N.E.2d 115, and *Plain Local Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision*, 130 Ohio St.3d 230, 2011-Ohio-3362, 957 N.E.2d 268.

[V.] The BTA erred in failing to consider the two financing appraisals that directly and irrefutably rebutted the owner's appraiser's assertions about the Subject Property having any alleged deferred maintenance as of the lien date.

[VI.] The BTA abused its discretion in failing to consider the two financing appraisals and Mr. Sprout's testimony thereof as additional objective support for the reasonableness of his value conclusions as of the lien date.

[VII.] The BTA abused its discretion in accepting an appraisal valuing the Subject Property at $11,120,000 when the four (4) other appraisals in the record before it valued the Subject Property at $14,900,000, $15,275,000, $16,040,000 and $17,429,000.

[VIII.] The BTA abused its discretion in adopting an appraisal for the Subject Property with a proforma net operating income that was approximately thirty percent (30%) less than the Subject Property's actual net operating income.

[IX.] The BTA abused its discretion in adopting an appraisal for the Subject Property with a market vacancy and collection

> loss higher than the Subject Property has ever experienced and unsupported by any market data in the record.
>
> [X.] The BTA unreasonably and unlawfully determined that the Subject Property's true value could be anything less than the current owner's purchase price of $13,253,000 in a distressed sale a mere fifty-five (55) days prior to the tax lien date.
>
> [XI.] The BTA erred in failing to adequately review the entire record replete with valuation evidence and determining a true value for the Subject Property nearly twenty percent (20%) lower than the recent distressed sale price and in excess of thirty percent (30%) lower than the lowest of the other four (4) appraisals valuing the Subject Property.

{¶ 6} Instead of addressing its assignments of error separately, the BOE addresses them in groups according to common propositions of law. We will address them in the same manner. Initially, we note that, pursuant to R.C. 5717.04, an appellate court reviews a BTA decision to determine whether it is " 'reasonable and lawful.' " *Dublin City Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision*, 10th Dist. No. 17AP-692, 2018-Ohio-4621,¶ 18, quoting *NWD 300 Spring, L.L.C. v. Franklin Cty. Bd. of Revision*, 151 Ohio St.3d 193, 2017-Ohio-7579, ¶ 13. " '[I]f it is both, we must affirm.' " *Id.*

{¶ 7} Appellate review of BTA decisions "is guided by the premise that '[t]he fair market value of property for tax purposes is a question of fact, the determination of which is primarily within the province of the taxing authorities.' " *NWD 300* at ¶ 13, quoting *EOP-BP Tower, L.L.C. v. Cuyahoga Cty. Bd. of Revision*, 106 Ohio St.3d 1, 2005-Ohio-3096, ¶ 17. The BTA's factual findings are entitled to deference as long as they are supported by reliable and probative evidence in the record. *Bd. of Edn. of the Westerville City Schools v. Franklin Cty Bd. of Revision*, 146 Ohio St.3d 412, 2016-Ohio-1506, ¶ 26.

{¶ 8} Furthermore, "[t]he standard for reviewing the BTA's determination of the credibility of witnesses and the weight to be given their testimony is abuse of discretion." *NWD 300* at ¶ 14. "Abuse of discretion connotes an unreasonable, arbitrary, or unconscionable attitude." *Renacci v. Testa, Tax Commr.*, 148 Ohio St.3d 470, 2016-Ohio-3394, ¶ 32.

{¶ 9} "The best method of determining value, when such information is available, is an actual sale of such property between one who is willing to sell but not compelled to

do so and one who is willing to buy but not compelled to do so." *State ex rel. Park Invest. Co. v. Bd. of Tax Appeals*, 175 Ohio St. 410, 412 (1964). Although, in the present case, the property was sold in October 2014, only a few months before the tax lien date of January 1, 2015, the sale of the property was conducted by a receiver and, thus, a forced sale under R.C. 5713.03. In the absence of a recent arm's-length sale, "an appraisal becomes necessary." *Schutz v. Cuyahoga Cty. Bd. of Revision*, 153 Ohio St.3d 23, 2018-Ohio-1588, ¶ 11.

{¶ 10} Here, the BOE relied on appraisal evidence from Sprout, and Jefferson Chase relied on appraisal evidence from Speert. With regard to its first, second, and third assignments of error, the BOE argues the BTA's determination that Sprout appraised the subject property by taking into account post-tax lien date cosmetic renovations is not supported by any evidence or testimony in the record. The BOE claims the sole reason the BTA rejected Sprout's appraisal was that it believed Sprout valued the property as if the post-tax lien date cosmetic renovations were complete as of the tax lien date. With regard to the evidence in the record, the BOE points out portions of Sprout's appraisal recognized that post-tax lien date improvements had occurred, and he took those into consideration in arriving at his appraisal. The BOE contends that, although Sprout assumed the roofs and mechanicals were in good repair as of the tax lien date, and the general condition of the property at the time of the viewing was reasonably similar to that as of the tax lien date, Sprout qualified such by acknowledging that, during his property visit, management informed him that the property had undergone interior and exterior renovations subsequent to its purchase in October 2014. The BOE also points out Sprout acknowledged a renovation had occurred post-tax lien date and specified that he was only relying on the interior finishes in place as of the tax lien date. The BOE further points out that Sprout noted many of the appliances in the units were replaced post-tax lien date, so he valued the furniture, fixtures, and equipment ("FF&E") as mostly depreciated. The BOE contends that Sprout specifically estimated the market rent for each unit based on the physical condition of the property as of the tax lien date.

{¶ 11} With regard to the testimony in the record, the BOE argues Sprout's testimony does not support the BTA's determination that he appraised the subject property as renovated by post-tax lien date cosmetic renovations. The BOE asserts his

testimony undoubtedly refers to the repair of previous fire damage as the only repairs or renovations Sprout considered. The BOE points out Sprout specifically acknowledged the property had been renovated after Jefferson Chase took over the property, as units came up for turnovers, and the condition of the renovated units on the date of his inspection were better than they were as of the tax lien date. The BOE also contends Sprout testified that, after reviewing the two mortgage reports that were completed just prior to the tax lien date, he saw there were 16 or 17 units that were damaged by fire that were going to be refurbished and completed by January 1, 2014. The BOE maintains the BTA incorrectly stated that Sprout believed the two financial appraisals indicated all of the general cosmetic renovations would be completed prior to the tax lien date, when it was clear from the testimony that Sprout only believed the renovations relating to the fire damaged units would be completed prior to the tax lien date.

{¶ 12} In its decision, the BTA summarized Sprout's appraisal using the income approach to valuation as follows:

> Mr. Sprout estimated the gross potential income of the subject property by looking to four rent comparables near the subject; he determined a market rent of $650 for the 48 1-bedroom/1-bath units, $750 for the 100 2-bedroom/1.5 bath units, $950 for the 44 3-bedroom/2 bath units, and $1,025 for the 48 3-bedroom/2.5 bath townhome units. He additionally added $50/month income for the 94 garages at the property to conclude to a gross potential rent of $2,422,800. From this, he deducted 6% for vacancy and collection loss, added $450/unit for water reimbursement and $600/unit for other income, to conclude to a net effective gross income of $2,529,432. He estimated expenses at $4,207 per unit, including a $300/unit reserve for replacement, to conclude to a net operating income ("NOI") of $1,519,855. He then capitalized the NOI at 9.44%, including tax additur, to determine a value of $16,100,000 as of tax lien date. After deducting $60,000, or $250/unit, for personal property, he arrived at a final value conclusion of $16,040,000 for the subject real property.

{¶ 13} In its analysis of Sprout's appraisal, the BTA found the following:

> It is [the appraisers'] differing premises about the condition of the property on tax lien date that is at the center of the appraisers' differing opinions of value. Mr. Sprout's analysis was premised on renovations already being made at the

property as of tax lien date, allowing the property to garner higher rental rates, as indicated in his appraisal report: "It is assumed the roofs and mechanical systems were in good repair as of the tax lien date. It is also assumed the general condition of the property at the time of viewing [i.e., May 5, 2017] was reasonably similar to that as of the tax lien date." * * * During his testimony, Mr. Sprout indicated that the two financing appraisals submitted to the BOR indicated that renovations on the property would be completed prior to tax lien date.

{¶ 14} The BTA then concluded the following:

Upon review of the record, we find Ms. Speert's analysis more probative based on her assumptions about the condition of the property on tax lien date. While we find no error in Mr. Sprout's analysis per se, his opinion of value is based on the assumption that renovations were in progress or complete on tax lien date.

{¶ 15} Upon review, we cannot determine whether the BTA's factual finding regarding "renovations" is supported by reliable and probative evidence in the record. By "renovations" the BTA may have meant all general updates to the rooms, buildings, and grounds, or it may have meant repairs to the fire damaged units, since the BTA referenced Sprout's testimony regarding the two financial appraisals, which assumed the fire damaged apartments were going to be completed by December 2013.

{¶ 16} Sprout's appraisal and testimony distinguished between the general "renovations" completed after the tax lien date and the repairs to the fire damaged units completed before the tax lien date. With regard to the May 5, 2017 appraisal, Sprout stated that he "assumed the roofs and mechanical systems were in good repair as of the tax lien date," and "assumed the general condition of the property at the time of viewing was reasonably similar to that as of the tax lien date." He then qualified these statements in the next sentence, stating that "it was brought to our attention by management during our May 5, 2017 property visit that the property had undergone interior and exterior renovations subsequent to its purchase (October 2014)." Likewise, later in the appraisal, Sprout stated, "[p]lease note many of the interior improvements within the units (as well as the exterior of the property) have been renovated subsequent to the tax lien date." He also acknowledged in the appraisal that "at the time of the viewing, a significant amount

of renovations had occurred that were not in place as of the tax lien date." With regard to the interior finishes, Sprout noted that his description was "as of the tax lien date." In his summary, he acknowledged again that "most of [the] units have had their appliance packages replaced subsequent to the tax lien date."

{¶ 17} Furthermore, Sprout testified that "[d]uring the course of my viewing, a lot of the improvements had gone through renovation. It's my understanding * * * that was completed subsequent to them taking over the property." He then stated that management indicated to him on the date of his inspection that there was "remodeling that was done to the units" and "the project was continuing to be remodeled." He also recognized that one of the units he viewed during the inspection had been renovated and those renovated units would have been "better than what they were." Sprout reiterated what he had indicated in his appraisal regarding the appliances that were replaced after the tax lien date: "Considering that, I believe, a lot of the appliances in the project were replaced subsequent to the tax lien date, I provided a minimal amount of $250 per unit for 240 units or $60,000." Therefore, Sprout's testimony and appraisal make clear that he recognized the general renovations were undertaken after the tax lien date, and he never indicated they were complete as of the tax lien date.

{¶ 18} Sprout's testimony regarding the fire damage was the following:

> **It was also after reviewing the two mortgage reports that there were 16 or 17 units that were damaged by fire that were going to be refurbished and brought back into the fold for market.** Both reports which -- the property inspections were done prior to 2015. Since those appraisers saw the property as it was prior to the tax lien date -- just prior to the tax lien date -- both indicated that those repairs were going to be completed prior to 1/1/1[4]. So all 240 units were available and in service based on those two appraisals.

(Emphasis added.) Sprout's later testimony on the subject of the repair of the fire damaged apartments was as follows:

> I'm going to start with the BBG appraisal * * *.
>
> They indicated in their report that the -- there was 16 down units, and they believed they were going to be ready for occupancy as of December 20, 2013. I think I said 2014 in my previous testimony. It's 2013.

{¶ 19} In light of Sprout's testimony and appraisal, if by "renovations" the BTA meant renovation of the fire damaged properties, then this would not be a valid reason to reject Sprout's report, because the fire damaged properties were, in fact, complete by the tax lien date, according to the record. In the end analysis, we are not certain what the BTA meant by "renovations." Therefore, we find the BTA's analysis was unclear, and we cannot determine whether it was reasonable and supported by reliable evidence. However, we note that, perhaps, the relevant issue is whether Sprout's opinion should have been given any weight whatsoever, given his assumptions were based on the two financing appraisals the BTA rejected. Regardless, the BTA cited three general reasons for rejecting Sprout's appraisal, and we are unable to determine whether one of those reasons is supported by reliable, probative evidence due to the BTA's ambiguous use of "renovation." Based on the uncertainty outlined above, and on the unique facts of this case, we must sustain the BOE's first, second, and third assignments of error. After review upon remand, the BTA may still find Speert's appraisal to be more probative and the proper evidence upon which to rely, but the ambiguity in the current judgment renders the judgment unreasonable and unlawful. *See Dublin City Schools Bd. of Edn.* at ¶ 18 (an appellate court reviews a BTA decision to determine whether it is reasonable and lawful).

{¶ 20} Given our treatment of the BOE's first, second, and third assignments of error and our need to remand the matter for reconsideration, we find the BOE's fourth, fifth, sixth, seventh, eighth, nine, tenth, and eleventh assignments of error are moot, and we decline to address them.

{¶ 21} Accordingly, we sustain the BOE's first, second, and third assignments of error and render the BOE's fourth, fifth, sixth, seventh, eighth, nine, tenth, and eleventh assignments of error moot. We reverse the Ohio Board of Tax Appeals' decision and order with regard to the matters addressed in the first, second, and third assignments of error, and remand the matter to the BTA for further proceedings and clarification as it deems necessary, at its sole discretion.

*Order reversed;*
*cause remanded.*

SADLER and BRUNNER, JJ., concur.

_____